# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY GEARY, | Case No. 1:17-cv-01340-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | (Doc. 1) |

_____/

On October 5, 2017, Plaintiff Tracy Geary ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## I.        BACKGROUND

On September 6, 2013, Plaintiff filed protectively an application for DIB payments, alleging

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6,7.)

that she became disabled on October 1, 2012, due to stage 3 breast cancer, anxiety, depression, high blood pressure, high cholesterol, hypothyroidism, and a torn medial collateral ligament (MCL) in her left knee. (Administrative Record ("AR") 23, 57–58, 71–72, 91, 97, 158–59, 173, 206, 249, 266.) Plaintiff was born on July 18, 1961, and was 51 years old on the alleged onset date. (AR 57, 71, 158, 170, 247, 263.) She has a high school education. (AR 50, 174, 665.) Plaintiff has past work experience as a customer service supervisor in a call center. (AR 52,175, 181, 190, 284.) She is 5 feet 1 inches tall and weighs approximately 170 to 194 pounds. (AR 26, 37, 173, 296, 642, 685, 703, 705, 708, 835, 836, 838, 1135, 1137.)

**A.     Relevant Medical Evidence[2]**

**1.     Orthopedic Surgeon Todd A. Shapiro, M.D.**

Plaintiff was diagnosed with stage 3 breast cancer in May 2013, and thereafter underwent a double mastectomy and four cycles of chemotherapy. (AR 25, 39, 62, 296, 304–22, 355, 357, 359, 361, 363, 365.) In August 2013, Plaintiff injured her left knee and complained of severe shooting pain and numbness. (AR 359, 386, 641, 648, 714, 727.) An MRI of Plaintiff's left knee performed on August 30, 2013, showed a tear of the posterior horn of the medial meniscus and small suprapatellar joint effusion. (AR 642, 645, 727.)

In October and November 2013, Plaintiff received corticosteroid injections in her left knee. (AR 379, 645, 647.) Plaintiff presented to Dr. Shapiro on January 31, 2014, complaining of "continued pain over the medial side of the knee despite conservative management" with injections. (AR 644.) Dr. Shapiro noted that a "posterior horn meniscal root avulsion" is a "difficult tear to treat" and has a "grim prognosis," as Plaintiff will "likely develop arthritis secondary" to the root avulsion. (AR 644.) Dr. Shapiro opined that Plaintiff is not a candidate for meniscal repair, but discussed the possibility of arthroscopy and meniscectomy in hopes of alleviating her symptoms. (AR 644.)

On February 26, 2014, Plaintiff underwent a left knee arthroscopy with a partial medial

---

[2] Plaintiff's assertions of error are limited to (1) the ALJ's residual functional capacity assessment, particularly the alleged failure to consider physical limitations related to Plaintiff's fibromyalgia, left knee impairment, and obesity; and (2) the ALJ's consideration of Plaintiff's subjective complaints. Only evidence relevant to those arguments is set forth below.

meniscectomy. (AR 650–51, 677–78.) Plaintiff attended a follow-up visit with Dr. Shapiro on May 28, 2014, at which time she reported that her knee is "not getting significantly better" and complained of "continued swelling" and "pain over the medial side of the knee." (AR 673.) On examination, Dr. Shapiro noted mild swelling but no deformity, a "moderate size effusion," and "medial joint line tenderness." (AR 673.) Plaintiff's range of motion was from full extension to 110 degrees knee flexion. (AR 673.) She was diagnosed with left knee osteoarthritis and status post left knee arthroscopy with debridement of medial meniscal root avulsion and was administered a corticosteroid injection for swelling. (AR 673–74, 873–74.) In July 2014, Plaintiff received a viscosupplementation injection procedure. (AR 869–70.)

On September 3, 2014, Plaintiff presented to Dr. Shapiro's office to evaluate her response to the injection procedure. (AR 868.) Plaintiff's knee showed no gross effusion or signs of infection. (AR 868.) A "varus deformity" and joint line tenderness were noted. (AR 868.) Her range of motion was unchanged from the previous visit and she walked with an antalgic gait. (AR 868.) Continued conservative treatment was recommended. (AR 868–87.) Plaintiff received further viscosupplementation injections in April 2015, and reported some improvements in her symptoms. (AR 860, 862–65.)

On May 27, 2015, Plaintiff presented to Dr. Shapiro's office for reevaluation of her left knee. (AR 860–81.) On examination, there was no deformity, erythema, or edema, and her surgical incisions were well-healed. (AR 860.) Plaintiff had "mild to moderate tenderness over the medial joint line." (AR 860.) She was a "few degrees short of full extension to 120 degrees of knee flexion," with "crepitus noted." (AR 860.) Plaintiff reported that she felt she could manage her symptoms going forward. (AR 860.)

**2.    Rheumatologist Sumeet K. Bhinder, M.D.**

On September 10, 2014, Plaintiff presented to Dr. Bhinder complaining of joint pain, "throbbing pain in her arms," and swelling in legs, feet, and ankles. (AR 882–83, 1140–41.) Dr. Bhinder noted that Plaintiff's laboratory tests revealed a positive antinuclear antibody (ANA) screening of 1:160, but her rheumatoid factor and anti-CCP results were negative. (AR 882, 1144.) Plaintiff had "multiple tender points" of fibromyalgia. (AR 882, 1140.) There was no "distinct

3

synovitis," but she had tenderness over a few of the metacarpophalangeal joints. (AR 882, 1140.) An x-ray of Plaintiff's bilateral feet performed August 26, 2014, showed "probably early arthritis or degenerative joint disease of the interphalangeal joints" and "bilateral calcaneal spurs." (AR 884, 1125, 1142.) Plaintiff's bilateral hands x-ray performed that same day revealed "early osteoarthritis or degenerative joint disease" and "probably bone island in the left fifth middle phalanx base." (AR 1124.) Dr. Bhinder diagnosed Plaintiff with fibromyalgia and prescribed Lyrica, to which Plaintiff had a "good response" but it was not covered by her insurance. (AR 882, 1140.) She was switched to gabapentin and given a trial of Plaquenil. (AR 882, 1140.)

Plaintiff presented to Dr. Bhinder on December 10, 2014, complaining of pain in her low back and arms. (AR 881, 1139.) On examination, Dr. Bhinder found no visible synovitis in Plaintiff's joints and increased her dosage of gabapentin. (AR 881, 1139.) On March 30, 2015, Plaintiff reported symptoms of leg cramps. (AR 879, 1137.) Dr. Bhinder noted that Plaintiff had recently been put on Cymbalta, had no lupus symptoms, and that "[c]linically, the tender points of fibromyalgia are under fair control." (AR 879, 1137.) On examination, he noted no visible synovitis. (AR 879.) Dr. Bhinder increased Plaintiff's dosage of Cymbalta. (AR 879, 1137.)

An MRI of Plaintiff's cervical spine conducted April 1, 2015, showed: straightening of the normal cervical lordosis with superimposed degenerative changes, most marked at C5-6, at which level there is mild canal stenosis, indentation upon the underlying spinal cord, and moderate-to-severe bilateral foraminal stenosis; mild canal stenosis with no cord compression and mild-to-moderate left-sided foraminal stenosis at C4-5; and mild canal stenosis with no compression and mild-to-moderate bilateral foraminal stenosis at C6-7. (AR 1090–91.) An MRI of Plaintiff's lumbar spine conducted that same day showed: mild canal, moderate right, and mild-to-moderate left-sided foraminal stenosis at L4-5; and mild-to-moderate canal and bilateral foraminal stenosis at L5-S1. (AR 1093.)

On May 29, 2015, Plaintiff presented to Dr. Bhinder for a follow-up appointment. (AR 877–80, 1135–36.) She complained of having "more achiness all over." (AR 877, 1135.) Plaintiff's physical examination showed "mildly active tender points over the lower back" but no visible synovitis. (AR 877, 1135.) Dr. Bhinder assessed Plaintiff with unspecified myalgia and

myositis, generalized osteoarthritis involving multiple sites, and "[o]ther nonspecific positive culture findings." (AR 877–78, 1135–36.) Fibromyalgia and positive ANA were also noted. (AR 878, 1136.)

### 3. Consultative Examiner Gil Schmidt, Psy.D.

On April 19, 2014, Plaintiff attended a consultative examination with psychologist Dr. Schmidt. (AR 664–70.) Dr. Schmidt observed that Plaintiff's gait appeared slow, suggesting possible physical pain, but that her mood was normal. (AR 664.) Plaintiff told Dr. Schmidt that she drove herself around town or had her husband drive her, and Dr. Schmidt observed that she appeared to be capable of taking the bus and walking short distances. (AR 666.) Plaintiff reported that she showered daily, can prepare and cook her own meals, and takes care of her own hygiene without prompts or assistance. (AR 667.) She has a "positive relationship" with her spouse and continues to have daily contact with her parents. (AR 666.)

Dr. Schmidt concluded that Plaintiff's "functional level appears to be adequate with no significant mental health impairment" and that her "mental health condition will probably abate within the next 12 months." (AR 668–69.)

### 4. State Agency Physicians

On May 2, 2014, J. Bonner, M.D., a state agency physician, reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC").[3] (AR 64–67.) Dr. Bonner found that Plaintiff could: occasionally lift and/or carry 50 pounds and frequently 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions; occasionally climb ladders, ropes, and scaffolds; occasionally kneel, crouch, and crawl; frequently balance and climb ramps and stairs; and avoid even moderate exposure to hazards

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

such as machinery and heights. (AR 66–67.) Dr. Bonner found that Plaintiff had no other limitations. (AR 66–67.)

On reconsideration on July 21, 2014, another state agency physician, Richard Betcher, M.D., reviewed the record and affirmed most of Dr. Bonner's findings, except that Dr. Betcher found that Plaintiff could frequently stoop, kneel, crouch, and crawl; could perform unlimited balancing; and had no environmental limitations. (AR 77, 79–83.)

**B.      Plaintiff's Statement**

On February 21, 2014, Plaintiff completed an adult function report. (AR 206–14.) Plaintiff reported that her illnesses and conditions include breast cancer and a torn MCL. (AR 206.) When asked to describe what she does from the time she wakes up to the time she goes to bed, Plaintiff reported that she sits at home and exercises her knee. (AR 207.) She needs help bathing. (AR 207.) Plaintiff reported that she does no cooking or household chores, as the smell of food makes her nauseous and her chemotherapy treatments make her weak. (AR 208–09.) Plaintiff's husband helps her clean and cook. (AR 207.)

Plaintiff goes outside three times a day and travels by walking and riding in a car. (AR 209.) She shops for groceries with her husband once a week for about an hour. (AR 209.) She does not go out alone because she is "unable to drive stick shift." (AR 209.) Plaintiff reported that she pays bills and counts change, but cannot handle a savings account or use a checkbook because she "cannot write." (AR 209.) Her interests and hobbies are watching television and using a computer. (AR 210.) Plaintiff reported talking socially with others every day and attending doctor's appointments once a week. (AR 210.) She can walk a quarter of a mile before needing to rest and can resume walking after 10 minutes. (AR 211.) Plaintiff uses a brace for her knee. (AR 212.) Plaintiff takes Percocet and Xanax, and experiences tiredness as a result. (AR 213.)

**C.      Plaintiff's Mother's Statement**

On February 27, 2014, Plaintiff's mother Judith Saffell completed a third-party adult function report. (AR 220–28.) Ms. Saffell reports that Plaintiff cannot walk, that her system is "out of whack," and that her thyroid is "non-functioning" due to chemotherapy. (AR 220.) Plaintiff's husband takes care of their dogs and her son and daughter do housework. (AR 221.)

Ms. Saffell reported that Plaintiff needs assistance putting on her clothes and to get to the bathroom and that Plaintiff does not go out or drive because she "can't get around by herself" and "can't use her legs." (AR 221, 223.) According to Ms. Saffell, the family uses the microwave and she (Ms. Saffell) cooks dinner two or three times per week. (AR 180.) Mr. Saffell reported that Plaintiff does not perform house or yard work due to her inability to walk or stand. (AR 223.)

Plaintiff's hobbies and interests include watching television and using a tablet to access the internet. (AR 224.) Plaintiff talks on the phone socially and uses Facebook daily. (AR 224.) Ms. Saffell reported that Plaintiff "can't walk right now" and used crutches after her surgery. (AR 225–26.)

**D.      Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on May 13, 2014, and again on reconsideration on July 24, 2014. (AR 91–102.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 104–16.) At the hearing on October 30, 2015, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 33–51.)

**1.      Plaintiff's Testimony**

Plaintiff lives in a two-story house with her husband and two children. (AR 38.) She was laid off from her job in 2012. (AR 39.) Plaintiff testified that she was diagnosed with breast cancer in May 2013. (AR 39.) She underwent a double mastectomy and had four chemotherapy treatments. (AR 39, 42.)

Plaintiff testified that after her first round of chemotherapy she was getting into her car when her left knee "gave out" and she couldn't walk. (AR 39–40.) Following arthroscopic surgery to her knee, which did not result in improvement, and injections, she was given a brace to wear. (AR 40, 46.) Plaintiff testified that the brace is uncomfortable and that she can only walk "about 1,000 feet, maybe." (AR 40.) Plaintiff was told by her doctors that her chemotherapy treatments may have weakened the tendons in her knees and experiences arthritis in her knee. (AR 43.) She sleeps on the couch because she cannot go up and down the stairs due to pain in her knee. (AR 38.) Plaintiff can lift a gallon of milk but not her 20-pound grandson. (AR 41.)

7

She can stand comfortably for "maybe five minutes" and can sit only 10 minutes before having to get up. (AR 41.) Plaintiff testified that her hands go numb after 10 minutes of using the computer to surf the internet. (AR 42.) She is left-handed and the numbness is worse in her left hand than her right, which she attributes to lymphedema. (AR 42, 49.) She also has "consistent" pain in her left arm due to arthritis that she rates an "8" out of "10." (AR 44, 48.) Plaintiff describes her arms and legs feel "heavy." (AR 44.)

Plaintiff also testified she has fibromyalgia, lupus, and a "bad thyroid." (AR 44, 46.) She takes Lyrica for the fibromyalgia, which helps "a little bit." (AR 47.) She lies down about an hour a day and the rest of the time alternates between sitting and walking around. (AR 47–48.) Plaintiff testified she experiences severe back spasms with activity. (AR 43.) She does not sleep very well and must rest all day. (AR 47.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that Plaintiff had past work as a customer service supervisor in a call center, Dictionary of Operational Titles (DOT) code 299.367-010, which is light exertional work with a specific vocational preparation (SVP)[4] of 6. (AR 51–52.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work background. (AR 52.) The VE was also to assume this person had the following limitations: lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking six hours out of eight; sitting six hours out of eight; never climb ropes, ladders, or scaffolds; kneel, crouch, crawl, and climb ramps and stairs occasionally; stoop, balance, handling, fingering, and feeling with the bilateral upper extremities frequently; no overhead reaching with the left extremity, otherwise frequent reaching in other directions or in other planes; unlimited reaching with the right upper extremity; and could not work around hazards such as dangerous equipment, machinery, or unprotected heights. (AR 52.) The VE testified that Plaintiff could perform her past work both as performed and per the DOT. (AR 52–53.) The ALJ asked a follow up question regarding a second

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

hypothetical worker who had the same limitations, except that her handling and reaching with the left dominant upper extremity was limited to occasional. (AR 54.) The VE testified that such an individual could not perform Plaintiff's past work nor any other work with transferrable skills. (AR 54.)

Finally, Plaintiff's attorney inquired of the VE whether the individual in the first hypothetical who would be unable to climb stairs could perform Plaintiff's past work or any work in the national economy. (AR 54.) The VE testified that that such an individual could perform Plaintiff's past work because stair climbing is not required for the job. (AR 54.)

**E.      The ALJ's Decision**

In a decision dated February 3, 2016, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 18–27.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 19–27.) The ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 1, 2012, the alleged onset date (Step One). (AR 20.) At Step Two, the ALJ found Plaintiff's following impairments to be severe: fibromyalgia, degenerative joint disease of the left knee, lymphedema, status-post breast cancer with bilateral mastectomy and reconstruction, degenerative disc disease of the cervical and lumbar spine, and obesity. (AR 20–21.) However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (Step Three). (AR 21–22.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at Steps Four and Five. (AR 22–27.) *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff retained the RFC:

> to perform light work (lift and/or carry 10 pounds occasionally and 10 pounds frequently) as defined in 20 CFR [§] 404.1567(b) except [s]he should not climb ladders, can occasionally kneel, crouch, crawl, and climb ramps and stairs; can frequently stoop and balance; avoid overhead reaching with left upper extremity; frequently reach in other directions; unlimited reaching with right upper extremity; frequently handle, finger and feel with bilateral upper extremities, and should avoid work around hazards such as equipment, machinery and heights.

(AR 22.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely credible." (AR 24.)  The ALJ found that, on the basis of the RFC assessment, Plaintiff retained the capacity to perform her past relevant work as a customer service supervisor.  (Step Four).  (AR 27.)

Plaintiff sought review of the decision before the Appeals Council, which denied review on August 10, 2017.  (AR 1–13.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

## II.        LEGAL STANDARD

### A.        Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." *Id.* § 423(d)(2)(B).  For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The Ninth Circuit provided

the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 404.1520(a)(4) (providing the "five-step sequential evaluation process"). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.     Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th

Cir. 2008) (citation omitted).  Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation."  *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"  *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins*, 466 F.3d at 885).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

### III.    DISCUSSION

Plaintiff contends that there is no substantial evidence to support the ALJ's RFC assessment because the ALJ failed to evaluate properly the impact of Plaintiff's fibromyalgia, left knee impairment, and obesity on her ability to perform light work.  (Doc. 13 at 6–8; Doc. 17 at 3–5.) Plaintiff further asserts that the ALJ erred in evaluating Plaintiff's credibility.  (Doc. 13 at 9–13; Doc. 17 at 6–7.)

Defendant responds that the ALJ's RFC determination took into consideration Plaintiff's severe impairments of fibromyalgia, degenerative joint disease of the left knee, and obesity, and Plaintiff fails to explain how the objective medical evidence warrants more restrictive limitations. (Doc. 16 at 6–11.)  Defendant also maintains that substantial evidence supports the ALJ's rejection of Plaintiff's subjective complaints.  (*Id.* at 12–16.)

## A. The ALJ Failed to Articulate Specific, Clear and Convincing Reasons to Discredit Plaintiff's Subjective Complaints of Pain

### 1. Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id*. The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id*. As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray*, 554 F.3d at 1226–27; 20 C.F.R. § 404.1529. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'" *Burrell v. Colvin*, 775

F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), *as amended* Apr. 9, 1996)).

### 2.    Analysis

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 24.)   The ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."   (AR 24.)   Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding.  *See Vasquez*, 572 F.3d at 591.

The ALJ found that Plaintiff's symptom statements were "not entirely credible" because (1) the statements are "greater than expected in light of the objective evidence of record" and the "positive objective clinical and diagnostic findings . . . do not support more restrictive functional limitations" (AR 26), (2) her "broad range of daily activities is not consistent with total disability" (AR 26), and (3) Plaintiff testified that she "stopped working because she was laid off not because of her impairments" (AR 26).  Plaintiff contends that the ALJ "failed to properly evaluate her subjective complaints." (Doc. 13 at 9.)  She is correct; the ALJ materially erred in discounting her statements' credibility, and those errors were not harmless.

### a.    Objective Evidence of Record

The ALJ discounted Plaintiff's allegations regarding the severity of her symptoms because the allegations are "greater than expected in light of the objective evidence of record." (AR 26.)  In reaching this conclusion, the ALJ failed to properly analyze Plaintiff's symptoms in light of the realities of her fibromyalgia diagnosis, which is undisputed.  (*See* Doc. 16 at 3; Doc. 17 at 4.)

The Ninth Circuit addressed treatment of symptom testimony in fibromyalgia cases in *Revels v. Berryhill*, 874 F.3d 648 (9th Cir. 2017).[5]  At the outset, the court noted that "[f]or a long time, fibromyalgia was 'poorly understood within much of the medical community.'"  *Id*. at 656 (quoting *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004)).  Fibromyalgia is unusual in

---

[5] Despite it being recent, controlling Ninth Circuit authority on the issue, neither party cites *Revels* in their briefing.

that patients have normal strength, sensation, and reflexes; their joints appear normal; and "'[t]here is an absence of symptoms that a lay person may ordinarily associate with joint and muscle pain.'" *Revels*, 874 F.3d at 656 (quoting *Rollins v. Massanari*, 261 F.3d 853, 863 (9th Cir. 2001) (Ferguson, J., dissenting).

In *Revels*, the ALJ determined that the claimant's "testimony was undercut by the lack of 'objective findings' supporting her claims of severe pain." *Id.* at 666. In doing so, the ALJ "highlighted several examinations that had mostly normal results, such as an X–ray and MRIs of [the claimant's] neck and back, as well as the nerve conduction and velocity study of her hands," and the ALJ "cited medical records showing that, at several doctor's appointments, [the claimant] exhibited normal muscle strength, tone, and stability, as well as a normal range of motion." *Id.* The Ninth Circuit held that the ALJ erred in discounting the claimant's testimony (as well as testimony provided by medical providers) because the ALJ failed to "consider" the claimant's "testimony in light of her fibromyalgia diagnosis." *Id.* In support of this holding, the Ninth Circuit observed that the physical examination results cited by the ALJ were "perfectly consistent with debilitating fibromyalgia," that fibromyalgia "is diagnosed 'entirely on the basis of patients' reports of pain and other symptoms,' and 'there are no laboratory tests to confirm the diagnosis,'" and that "fibromyalgia is diagnosed, in part, by evidence showing that another condition does not account for a patient's [reported] symptoms." *Id.* (quoting *Benecke*, 379 F.3d at 590). The court noted that, in addition to the lack of any objective, laboratory testing that might confirm the diagnosis, the symptoms of fibromyalgia are known to "wax and wane," with the result that patients have "bad days and good days." *Revels*, 874 F.3d at 657 (citing TITLES II AND XVI: EVALUATION OF FIBROMYALGIA, Social Security Ruling, ("SSR") 12-2p, 77 FR 43640-01 (July 25, 2012)). Thus, the ALJ must, necessarily, "consider a longitudinal record whenever possible," when determining the RFC of a patient with fibromyalgia. *Id.* The Ninth Circuit added that "[i]n evaluating whether a claimant's [RFC] renders them disabled because of fibromyalgia, the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods" and "[t]he failure to do so is error." *Id.* at 662.

Here, the ALJ's analysis of Plaintiff's testimony is problematic for the same reasons the

Ninth Circuit noted in *Revels*.  In discounting Plaintiff's testimony, the ALJ stated that the "positive objective clinical and diagnostic findings . . . do not support more restrictive functional limitations," noting that, despite receiving injections to her knee, Plaintiff had a "normal gait and range of motion" in her left knee on examination.  (AR 26.)  The ALJ's decision detailed other examinations and testing that showed essentially normal or mild findings.  (*See* AR 24 (stating physical examination in May 2014 revealed "mild swelling" and full extension to 110 degrees flexion in Plaintiff's left knee), AR 25 (noting Plaintiff had "mild to moderate tenderness" in her left knee and was "a few degrees short of knee flexion" in May 2015; that MRIs of Plaintiff's cervical and lumbar spine in April 2015 showed "mild canal stenosis"; and that Plaintiff had "no visible synovitis" in May 2015).)  These examination results do not undermine Plaintiff's testimony regarding her fibromyalgia, and there is no indication in the ALJ's decision that the ALJ considered fibromyalgia's unique symptoms and diagnostic methods in concluding certain disabling effects were undermined by the record.  *See Revels*, 874 F.3d at 656, 666–67.  *See also Sharpes v. Berryhill*, Case No. C17-1425JLR, 2018 WL 2328558, at *3 (W.D. Wash. May 23, 2018); *Nunn v. Berryhill*, Case No. 6:17–cv–00203–SB, 2018 WL 2244705, at *12 (D. Or. May 16, 2018); *Bates v. Berryhill*, No. 5:16-CV-01555 (VEB), 2018 WL 1381974, at *8 (C.D. Cal. Mar. 19, 2018).

In addition, the ALJ's decision provides little to no guidance as to which disabling effects the ALJ believes to be undermined by which aspects of the record.  To be clear and convincing, the ALJ must specify which of the claimant's complaints are contradicted by which clinical observations.  *See Laborin v. Berryhill*, 867 F.3d 1151, 1155 (9th Cir. 2017) (where there is no evidence of malingering, "the ALJ must give 'specific, clear, and convincing reasons for rejecting' the testimony by identifying '*which* testimony [the ALJ] found not credible' and explaining '*which* evidence contradicted that testimony'") (quoting *Brown–Hunter v. Colvin*, 806 F.3d 487, 489, 494 (9th Cir. 2015)); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999) (holding that an ALJ's determination that a claimant was not credible because his "complaints are 'inconsistent with clinical observations' . . . . could satisfy the requirement of a clear and convincing reason for discrediting a claimant's testimony, except that

the ALJ did not specify what complaints are contradicted by what clinical observations.")  Here, the ALJ references Plaintiff's lack of recurrence of breast cancer and breast reconstruction surgery, the ruling out of lupus in favor of fibromyalgia, and Plaintiff's normal gait and range of motion in her left knee in January 2015 (AR 26), but the ALJ does not specify how this evidence discredits Plaintiff's statements that she can only walk about 1,000 feet (AR 40), that she experiences arthritis in her knee (AR 43), that she cannot go up and down the stairs in her home (AR 38), that she can only stand comfortably for five minutes (AR 41), that she can sit only 10 minutes before having to get up (AR 41), that her hands go numb after 10 minutes of using the computer (AR 42), that she has consistent severe pain in her left arm (AR 44, 48), that she experiences back spasms with activity (AR 43), and that must to rest all day due to sleep disturbance (AR 47).  In the absence of any linkage between the objective evidence of record and Plaintiff's statements, the Court is left to speculate as to which statements the ALJ intended to discount and how they are undermined by the evidence.  This the Court cannot do.  *See Brown–Hunter*, 806 F.3d at 494–95 ("We cannot review whether the ALJ provided specific, clear, and convincing reasons for rejecting [claimant]'s pain testimony where, as here, the ALJ never identified *which* testimony she found not credible, and never explained *which* evidence contradicted that testimony . . . . In sum, we cannot substitute our conclusions for the ALJ's, or speculate as to the grounds for the ALJ's conclusions.").  The lack of support by the objective medical evidence, as articulated by the ALJ, is therefore not a clear and convincing reason to reject Plaintiff's symptom statements.  *See Revels*, 874 F.3d at 656, 666–67; *Coleman v. Astrue*, 423 F. App'x 754, 755 (9th Cir. 2011) (holding that ALJ erred by "rel[ying] on the absence of objective physical symptoms of severe pain as a basis for disbelieving [claimant's] testimony regarding" effects of fibromyalgia symptoms); *Clemens v. Comm'r of Soc. Sec. Admin.*, No. CV-17-00054-TUC-EJM, 2018 WL 1391751, at *11 (D. Ariz. Mar. 20, 2018); *Cash v. Berryhill*, Case No. 17-cv-00041-W-JLB, 2018 WL 571940, at *9–10 (S.D. Cal. Jan. 26, 2018).

> **b.      Activities of Daily Living**

The ALJ also failed to adequately support her finding that Plaintiff's daily activities are inconsistent with her subjective complaints.  The ALJ simply states that Plaintiff's "broad range

of daily activities is not consistent with total disability." (AR 26.) The decision then lists, without analysis, Plaintiff's activities of performing independent personal care, preparing simple meals, doing light duty domestic chores, driving herself around town, taking public transportation, walking short distances, shopping, paying bills, counting change, watching television, using a computer, going on Facebook, maintaining a positive relationship with her husband, and having daily contact with her parents. (AR 26.) The Ninth Circuit has repeatedly stated that "the mere fact that a plaintiff has carried on certain daily activities ... does not in any way detract from [a claimant's] credibility as to [his or] her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). *See also Revels*, 874 F.3d at 667. Accordingly, to base an adverse evaluation on Plaintiff's activities of daily living, the ALJ must either explain how Plaintiff's activities are inconsistent with her testimony or how the activities of daily living meet the threshold for transferable work skills. *See Molina*, 674 F.3d at 1112–13 (Activities of daily living may be used to discredit a claimant where they either "are transferable to a work setting" or "contradict claims of a totally debilitating impairment."); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Further, where the ALJ looks to daily activities to discredit pain testimony, the Ninth Circuit has instructed that "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016.

The ALJ failed to meet this standard because she did not consider the full context of the reported activities of daily life, particularly in view of the "wax and wane" of Plaintiff's symptoms, which is commonly associated with fibromyalgia. *See Revels*, 874 F.3d at 657 (citing SSR 12-2p); *Nunn*, 2018 WL 2244705, at *13–14. In *Reddick v. Chater*, 157 F.3d 715, 722–723, 723 n.1 (9th Cir. 1998), the Ninth Circuit reversed because the lower court (and the ALJ) failed to "fully account[ ] for the context of materials or all parts of the testimony," including that the claimant performed daily activities with help, in pain, and required periodic rest. The same error was committed here. The ALJ ignored accompanying testimony showing that due to Plaintiff's

pain and fatigue, she could perform activities of daily life only with significant effort, assistance, or frequent breaks. *See* AR 207 (needs help bathing), AR 207–09 (husband helps her clean and cook because chemotherapy makes her nauseous and weak), AR 209 (husband accompanies her when grocery shopping), AR 211 (can walk only a quarter mile before needing to rest); AR 42 (hands go numb when using computer after 10 minutes), AR 40 (Plaintiff uses a knee brace to walk with difficulty). Plaintiff's mother's statement confirms these facts. (*See* AR 221 (Plaintiff's husband helps her dress); AR 221, 225 (Plaintiff's son and daughter do housework), AR 222 (family uses microwave and Plaintiff's mother cooks dinner two or three times a week), AR 223–24 (Plaintiff cannot get around by herself and needs someone to accompany her).

Because the ALJ failed to explain how Plaintiff's daily activities (with these difficulties included) are inconsistent with the alleged severity of Plaintiff's symptoms, or alternatively how the activities would translate to a job setting, the ALJ's reliance on such activities as a clear and convincing reason to discount Plaintiff's subjective complaints was erroneous. *Revels*, 874 F.3d at 664 (reversing lower court partly because the ALJ failed to consider context of daily activities of "using the bathroom, brushing her teeth, washing her face, taking her children to school, washing dishes, doing laundry, sweeping, mopping, vacuuming, going to a doctor's appointment for her or for one of her children, visiting her mother and father, cooking, shopping, getting gas, and feeding her dogs" where she could "complete only some of the tasks in a single day and regularly needed to take breaks"). *See Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017) ("That [Plaintiff] could participate in some daily activities does not contradict the evidence of otherwise severe problems that she encountered in her daily life during the relevant period."); *Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017) (as amended) ("attending church and shopping for groceries" not inconsistent with plaintiff's moderate limitations; *Trejo v. Berryhill*, Case No. EDCV 17-0879-JPR, 2018 WL 3602380, at *18 (C.D. Cal. July 25, 2018).

### c. Reason for Work Cessation

Finally, in discrediting Plaintiff's statements for lack of support by the objective evidence, the ALJ observed that Plaintiff "testified that she stopped working because she was laid off not because of her impairments." (AR 26.) It is not clear whether the ALJ intended to discredit

19

Plaintiff's subjective complaints on this basis, as this conclusory statement does not provide any explanation as to how it somehow undermines Plaintiff's subjective symptom statements or their limiting effects. *See Kalani v. Colvin*, Case No. 13–cv–04591-KAW, 2015 WL 1250719, at *6 (N.D. Cal. Mar. 18, 2015) (The ALJ's failure to articulate inconsistencies in his credibility determination "is enough to reject his judgment that Plaintiff's reason for leaving her former employment undermines her credibility.") To the extent the ALJ is implying that this testimony is inconsistent with Plaintiff's other statement that she stopped working because of her condition (AR 174), the two statements are not inherently inconsistent with her disability and, in fact, Plaintiff's clarification at the hearing that she was unable to work as of May 2013 (AR 39) suggests that Plaintiff was attempting to be forthcoming in her response. *See Villa v. Berryhill*, No. CV 17-6332-PLA, 2018 WL 4677690, at *10 (C.D. Cal. Sept. 26, 2018) (finding where plaintiff admitted that he stopped work because of his physical condition and because he did not have a job to return to and therefore may have considered that he had been fired "does not undermine his credibility; in fact, it tends to show that plaintiff was attempting to be forthright and complete in his responses"). In addition, as Plaintiff testified and the medical evidence shows, in May 2013, seven months after being laid off, Plaintiff was diagnosed with stage 3 breast cancer. (AR 39.) The ALJ's decision does not consider the fact that Plaintiff may have been laid off because of impairments due to her yet-to-be-diagnosed breast cancer. *See, e.g., Mangat v. Colvin*, No. 15-CV-2312-AJB-RBB, 2017 WL 1223881, at *6 (S.D. Cal. Feb. 3, 2017) (finding that purported inconsistency between the plaintiff's statements that he stopped working due to disability and that he was laid off did not support discrediting the plaintiff where the ALJ failed to consider evidence of the plaintiff's impairments before and after his layoff).

Moreover, Plaintiff's medical issues, particularly the pain she experiences in her left knee, back, and hands, are degenerative in nature, as confirmed by the objective medical testing in the record. (AR 20, 884, 1090–91, 1093, 1124, 1125, 1142.) Under these circumstances, one would expect that Plaintiff's condition would worsen over time, even if these degenerative conditions were not the reason she initially stopped working in October 2012, her alleged onset date. While she might well not have been disabled when she first stopped working, she may well have been

disabled thereafter. The fact that Plaintiff may have stopped working initially for reasons that are unrelated to her alleged disability is not a clear and convincing reason to discount her symptoms under these circumstances. *See Pipkin v. Berryhill*, Case No. 17-cv-02657-EDL, 2018 WL 2183273, at *16 (N.D. Cal. May 11, 2018).

Defendant cites *Bruton v. Massanari*, 268 F.3d 824 (9th Cir. 2001), in support of her contention that this is sufficient reason to discredit Plaintiff. (*See* Doc. 16 at 15.) *Bruton*, however, is factually distinct. In *Bruton*, the court affirmed the ALJ's negative credibility finding for the specific reason that the claimant lied about why he left his job when there was direct evidence that contradicted his allegation that he left because of an injury. *See Bruton*, 268 F.3d at 828. Further, in *Bruton*, the ALJ gave additional, appropriate reasons to reject the plaintiff's testimony regarding subjective pain, namely that he waited nine months to seek any medical treatment despite his complaints of severe pain. *Id.* Here, unlike *Bruton*, there is not a direct contradiction between Plaintiff's testimony that she was laid off in October 2012 and her statement that she stopped working due to her conditions, as the reason for her layoff could have been related to her conditions. Nor have the ALJ's other reasons to reject Plaintiff's testimony been found to be clear and convincing, in contrast to *Bruton*. Even if the ALJ intended to discount Plaintiff's subjective symptom statements based on her testimony that she was laid off and this was a valid reason for doing so, the Court cannot conclude that the ALJ's errors in discounting those statements' credibility because of a lack of support by objective findings and Plaintiff's daily activities were harmless. *See Hamilton-Carneal v. Colvin*, 670 F. App'x 613, 614 (9th Cir. 2016) (holding that error in ALJ's discounting of claimant's fibromyalgia-related "subjective complaints" was not harmless despite her providing other legitimate reasons because "the ALJ's decision indicate[d] that the absence of 'objective medical evidence' was a central factor in her determination"); *Trejo*, 2018 WL 3602380, at *19.

In sum, the ALJ's opinion does not meet the clear and convincing standard because the ALJ fails to both adequately identify which of Plaintiff's statements she finds not credible and articulate the nexus between those statements that the ALJ discredits and the record—including the objective medical evidence and activities of daily living—that purportedly undermines them

in light of fibromyalgia's unique symptoms and diagnostic methods. This constitutes reversible error, as the Court cannot say that the ALJ's RFC determination accounted for all of Plaintiff's limitations even though her testimony was discredited. *See Revels*, at 662–66; *Brown–Hunter*, 806 F.3d at 494–95. *See also Sharpes*, 2018 WL 2328558, at *4.

**B.      The ALJ's Error Warrants Remand for Further Proceedings**

When an ALJ commits error that is not harmless, "[t]he decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court." *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke*, 379 F.3d at 593. Furthermore, "[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). On the other hand, "where the record has been fully developed such that further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Benecke*, 379 F.3d at 593. *See also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2016).

Here, the ALJ committed legal error that was not harmless, but, as Plaintiff concedes (Doc. 13 at 12), this is not a case where further administrative proceedings would lack purpose. The ALJ failed to sufficiently articulate her credibility analysis, particularly considering Plaintiff's fibromyalgia diagnosis and binding Ninth Circuit authority. This failure can be remedied on remand. *See Trejo*, 2018 WL 3602380, at *20 ("[F]urther administrative proceedings would serve the useful purpose of allowing the ALJ to evaluate the record in light of the unique characteristics of fibromyalgia, and to resolve some of the inconsistencies in the record, including Plaintiff's work history, daily activities, and CPAP noncompliance.") (citing *Revels*, 874 F.3d at 667 n.6; *Garrison*, 759 F.3d at 1021) (internal citations and quotations omitted). *See also Voisard v. Berryhill*, No. 2:17-CV-1023-EFB, 2018 WL 4488474, at *5 (E.D. Cal. Sept. 19, 2018) ("That the ALJ failed to provide sufficient reasons for discounting plaintiff's subjective testimony in this instance does not compel a finding that he is unable do so.").

Further, even if the ALJ decides to credit as true each of Plaintiff's statements about the

disabling effects of her impairments and then adjust her RFC determination for Plaintiff, the ALJ may still conclude Plaintiff is not disabled, either because she has the RFC to perform the requirements of her past relevant work as an customer service supervisor or because she has the RFC to perform the requirements of other work that exists in significant numbers in the national economy. Moreover, the ALJ may opt to further develop the record, such as probing into Plaintiff's basis for being laid off from work in October 2012 and whether an amendment of her alleged onset date is warranted. (AR 39; Doc. 13 at 11.) Therefore, remand for further proceedings is the appropriate remedy.

On remand, the ALJ should reevaluate Plaintiff's symptom testimony in accordance with SSR 12-2p, taking into account the full range of medical evidence, and further develop the record as necessary to address any changes to the RFC determination. If the ALJ again discounts Plaintiff's subjective symptoms, she can then provide an adequate discussion of the evidence justifying her doing so. *See Payan v. Colvin*, 672 F. App'x 732, 733 (9th Cir. 2016). The ALJ must also reevaluate her conclusions at Steps Four and Five of the disability determination in light of any changes to Plaintiff's RFC.

**C.    The Court Declines to Determine Plaintiff's Remaining Assertions of Error**

As the Court finds that remand is appropriate for the ALJ to reconsider Plaintiff's subjective complaints and reassess Plaintiff's RFC, the Court need not address Plaintiff's allegation of error concerning the ALJ's present RFC assessment and its failure to account for limitations related to Plaintiff's fibromyalgia, left knee impairment, and obesity. *See, e.g., Newton v. Colvin*, No. 2:13–cv–2458–GEB–EFB, 2015 WL 1136477, at *6 n.4 (E.D. Cal. Mar. 12, 2015) ("As the matter must be remanded for further consideration of the medical evidence, the court declines to address plaintiff's remaining arguments.").

## IV.    CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Tracy Geary and against Defendant Nancy A. Berryhill, Acting Commissioner

of Social Security.

IT IS SO ORDERED.

Dated:   **November 26, 2018**                    /s/ *Sheila K. Oberto*
UNITED STATES MAGISTRATE JUDGE